UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

Mitchell Theophilus Garraway,                    :
                                                 :
                    Plaintiff                    :        No. 4:CV-10-1697
                                                 :
             vs.                                 :        (Judge Nealon)
                                                 :
                                                 :                    **FILED**
Harley G. Lappin, et al.,                        :                    **SCRANTON**
                                                 :
                    Defendants                   :        MAR 2 1 2012

### MEMORANDUM

PER _____
                    DEPUTY CLERK

## BACKGROUND

        Plaintiff, an inmate confined in the United States Penitentiary, Lewisburg

("USP-Lewisburg"), Pennsylvania, filed the above captioned Bivens[1] action, in

which he raises "challenge[s] under the Religious Freedom Restoration Act of 1993

(RFRA) 42 U.S.C. § 2000bb et seq. and the Religious Land Use and

Institutionalized Persons Act of 2000 (RLIUPA) 42 U.S.C. § 2000cc et seq. to

frivolous and arbitrary Federal Bureau of Prisons (BOP) rules and policies which

severely and unnecessarily burden Muslim prisoners' private religious exercise."

_____

1. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,
403 U.S. 388 (1971).

(Doc. 27, Amended Complaint).

Garraway, a military prisoner, was sentenced on February 18, 1986, to a term of Life. (Doc. 39, Declaration of Kevin Kelley, Bureau of Prisons Regional Chaplain Administrator at ¶ 4). He was incarcerated at USP-Lewisburg from October 15, 2007, through June 4, 2009. Id. at ¶ 3. He was then transferred to USP-Canaan until his transfer back to USP-Lewisburg on or about May 24, 2011. (See Doc. 52, Notice of Change of Address).

Garraway names as Defendants: Harley Lappin, Director; Current/former employees of USP-Lewisburg: Troy Williamson, Warden (retired); Frank Strada, Correctional Services Administrator (former Associate Warden); Kevin Kelley, Regional Chaplaincy Administrator (former Supervisory Chaplain); Rod Kerstetter, retired (former Inmate Systems Manager); Salvadore Irizzary, Chaplain, USP Hazelton (former Chaplain); and R. Rogers, Food Services Administrator. (Doc. 27, Amended Complaint). Garraway also names the following employees of USP-Canaan: Ronnie Holt, Warden; John Johnson, Supervisory Chaplain; Angela Dunbar, Associate Warden; D. Mrad, Lieutenant; R. Sorenson, Lieutenant; Thomas

Diehl, Trust Fund Manager; and Ralph Gundrum, Food Services Administrator.[2] Id.

Currently pending before the court is Defendants' motion to dismiss or, in the alternative, for summary judgment. (Doc. 31). The parties have fully briefed the issues and the motion is now ripe for disposition. For the reasons that follow, the Court will grant Defendants' motion to dismiss or, in the alternative, for summary judgment.

## I.  **Standards of Review**

### A.  **Motion to Dismiss**

The Court in Williams v. Hull, 2009 WL 1586832, *2-*3 (W.D.Pa.), set forth the Motion to Dismiss standard of review, as annunciated by the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, (2007), and as refined in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), as follows:

> The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. Neitzke; Scheuer v. Rhodes, 419 U.S. 232 (1974). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face."

---

2. The Plaintiff also names AFNU Johnson, Inmate Trust Fund Manager, however, there is/was no staff member by that name in that position.

> Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955,
> 167 L.Ed.2d 929 (2007) (rejecting the traditional 12(b)(6) standard
> set forth in Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d
> 80 (1957)). See also Ashcroft v. Iqbal, ---U.S. ----, ----, 129 S.Ct.
> 1937, ----, 173 L.Ed.2d 868, ----, 2009 WL 1361536 (May 18,
> 2009) (specifically applying Twombly analysis beyond the context
> of the Sherman Act). The court must accept as true all allegations of
> the complaint and all reasonable factual inferences must be viewed
> in the light most favorable to plaintiff. Angelastro v.
> Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir.1985).
> The Court, however, need not accept inferences drawn by plaintiff
> if they are unsupported by the facts as set forth in the complaint.
> See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394
> F.3d 126, 143 (3d Cir.2004) citing Morse v. Lower Merion School
> Dist., 132 F.3d 902, 906 (3d Cir.1997). Nor must the court accept
> legal conclusions set forth as factual allegations. Twombly, 550
> U.S. at 556, citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct.
> 2932, 92 L.Ed.2d 209 (1986). "Factual allegations must be enough
> to raise a right to relief above the speculative level." Twombly, 550
> U.S. at 556. Although the United States Supreme Court does "not
> require heightened fact pleading of specifics, [the Court does
> require] enough facts to state a claim to relief that is plausible on its
> face."

Id. at 570.  In other words, at the motion to dismiss stage, a plaintiff is "required to

make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith

v. Sullivan, 2008 WL 482469, at *1 (D.Del. February 22, 2008) quoting Phillips v.

County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008).  "This does not impose a

probability requirement at the pleading stage, but instead simply calls for enough

facts to raise a reasonable expectation that discovery will reveal evidence of the

necessary element." Phillips, 515 F.3d at 232, quoting Twombly, 550 U.S. at 556 n. 3.

## B. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d

1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed.R.Civ.P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial." <u>Celotex</u>, 477 U .S. at 323; <u>see</u> <u>Harter v. G.A.F. Corp.</u>,

967 F.2d 846, 851 (3d Cir. 1992).  Failure to properly support or contest an assertion

of fact may result in the fact being considered undisputed for the purpose of the

motion, although a court may also give parties an opportunity to properly provide

support or opposition.  Fed.R.Civ.P. 56(e).

**II.      Statement of Facts**

Due to the voluminous allegations contained within the complaint, the Court

will dispense with a separate statement of facts and, instead, will apply the

undisputed facts to each of Plaintiff's individual claims as they are derived from the

pleadings, declarations and exhibits submitted therewith.

**III.     Discussion**

**A. RLUIPA**

Under the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), "government" is defined as "a State, county, municipality, or other

governmental entity created under the authority of a state," and "any branch,

department, agency, instrumentality or official," thereof, and "any other person

acting under color of State law."  42 U.S.C. § 2000cc-5(4).  Accordingly, federal

courts have held that RLUIPA "only applies to state and local governments, not a

federal prison." Pineda-Morales v. DeRosa, 2005 WL 1607276, at *4 (D.N.J. 2005).

See also Navajo Nation v. U.S. Forest Service, 535 F.3d 1058 (9th Cir. 2008).

Because Plaintiff is a federal inmate, all RLUIPA claims will be dismissed.

## B. **Statute of Limitations for RFRA Claims**

RFRA contains no express limitations period, "a void which is

commonplace in federal statutory law." Board of Regents v. Tomanio, 446 U.S.

478, 483 (1980).

In 1990, Congress established a general statute of limitations. See Jones v.

R.R. Donnelley & Sons Co., 541 U.S. 369, 379-80 (2004). Section 42 U.S.C.

1658(a) provides: "Except as otherwise provided by law, a civil action arising under

an Act of Congress enacted after the date of the enactment of this section may not be

commenced later than 4 years after the cause of action accrues." 28 U.S.C.A. §

1658(a).

RFRA was enacted in 1993, and § 1658 therefore applies to claims arising

under it. See, e.g., Jama v. U.S. INS, 343 F.Supp.2d 338, 365 (D. N.J. 2004)

("RFRA has a statutory four-year statute of limitations."). Thus, Garraway had four

years to file his action from the time the cause accrued. The majority of Plaintiff's

allegations concern time frames from "August 2006 to on or about May 2009";

-8-

although there are allegations as early as 2004 and as late as "to present." (Doc. 27, Amended Complaint).

To the extent that Plaintiff may argue that Defendants' actions constituted a continuing tort, if a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing pattern falls within the limitations period. Brenner v. Local, 514, 927 F. 2d 1283, 1295 (3d Cir. 1991). However, the "continuing violation doctrine" focuses on "affirmative acts of a defendant," and is not "a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims." Cowell v. Palmer Township, 263 F.3d 286, 293, 295 (3d Cir. 2001). Although Plaintiff makes vague allegations that some of his numerous complaints span a time frame of several years, he provides essentially no specific dates regarding the specific incidents or specific defendant involvement sufficient to show a specific defendant's conduct was part of a continuing practice. Thus, for RFRA statutory purposes, the Plaintiff's amended complaint will be limited only to issues arising on or after August 13, 2006.

### C. **Statute of Limitations for Constitutional Claims**

Plaintiff's constitutional claims are subject to different statute of limitations treatment than his RFRA claims. Section 1658(a) does not apply to Bivens

constitutional claims because they do not arise under an act of Congress after 1990. Defendants argue that <u>Wilson v. Garcia</u>, 471 U.S. 261(1985), applies to establish the statute of limitations for Plaintiff's constitutional claims. (Doc. 39.) This Court agrees.

In <u>Wilson</u>, the Supreme Court established a standard approach to determine the statute of limitations for civil rights claims against the states under 42 U.S.C. § 1983. 471 U.S. 261. Since § 1983 contains no express limitation, the Court applied 42 U.S.C. § 1988, which borrows the "most appropriate" or "most analogous" state statute of limitations. <u>Id.</u> at 268. The Court decided that a "simple, broad characterization" of all claims under § 1983 avoided the "uncertainty and time-consuming litigation" inherent in analyzing the facts in each particular claim. <u>Id</u>. at 273. The Court found that a state's limitation for recovering damages for personal injury torts was the appropriate choice. <u>Id.</u> at 279-280.

In Pennsylvania, a <u>Bivens</u> claim in which the plaintiff is alleging personal injury has a two year statute of limitations. <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 190 (3d Cir. 1993); <u>King v. One Unknown Federal Officer</u>, 201 F. 3d 910, 913, (7th Cir. 2000)(noting the same statute of limitations applies to all <u>Bivens</u> and § 1983 actions); 42 Pa. Cons. Stat. § 5524.

A <u>Bivens</u> claim accrues when the plaintiff knows, or has reason to know, of the injury that forms the basis of the action.  <u>Sameric Corp. Of Del. v. City of Philadelphia</u>, 142 F3d 582, 599 (3d Cir. 1998). The limitations period begins to run if a plaintiff has sufficient notice to place him on alert of the need to begin investigating.  <u>Gordon v. Lowell</u>, 95 F. Supp. 2d 264, 272 (E.D. Pa. 2000).  Per <u>Gordon</u>, a "claim accrues upon knowledge of the actual injury, not that the inquiry constitutes a legal wrong."

For <u>Bivens</u> purposes, the amended complaint should be limited to complaints arising on or after August 13, 2008, as the Pennsylvania two-year statute of limitations applies here.  As such, all claims concerning Defendant Warden Williamson are time barred since Warden Williamson retired from BOP service in February 2008.  Arguably, anything else that preceded August 13, 2008, should be time barred as there is nothing in the complaint to demonstrate a "continuing violation".

### D.  Damage Claims against Defendants in their Individual Capacity

Defendants contend that Plaintiff's claims for monetary damages against them in their individual capacities are not supported by the RFRA.  They cite seven cases.

-11-

Of the seven cases cited by the Defendants, six of them are Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc et seq., cases. See Nelson v. Miller, 570 F.3d 868 (7th Cir. 2009); Rendelman v. Rouse, 569 F.3d 182 (4th Cir. 2009); Sossamon v. Texas, 560 F.3d 316 (5th Cir. 2009), aff'd, S.Ct. (2011) (addressing official capacity claims and holding that Section 3 of RLUIPA does not allow an individual to sue a state or a state official in his official capacity for monetary damages); Smith v. Allen, 502 F.3d 1255 (11th Cir. 2007); Porter v. Beard, 2010 WL 2573878 (W.D. Pa. May 12, 2010); Logan v. Lockett, 2009 WL 799749 (W.D. Pa. Mar. 25, 2009).

The latter two cases— Porter and Logan—contain no reasoning for their determination that damages against defendants in their individual capacities are not allowed pursuant to RLUIPA.  Rather they just cite other cases that so hold. The reasoning of the other four cases is substantially as follows: RLUIPA was enacted pursuant to Congress' Spending Clause power; statutes enacted pursuant to the Spending Clause are contractual in nature; only the contractual recipient of federal funds may be liable for damages for a violation of Spending Clause legislation; the states—not individual state officials—are the recipients of federal funds under Spending Clause legislation; therefore, individual state officers sued in their

-12-

individual capacities are not liable for damages for violations of RLUIPA. <u>See</u> Nelson, <u>supra</u>, 570 F.3d at 886–89; <u>Rendelman</u>, <u>supra</u>, 569 F.3d at 188–189; <u>Smith</u>, <u>supra</u>, 502 F.3d at 1272–75; <u>Sossamon</u>, <u>supra</u>, 560 F.3d at 328–29.

This case is a RFRA case. RFRA is not Spending Clause legislation. As such, the reasoning of the RLUIPA cases cited by the Defendants is not applicable.

The Defendants have cited one RFRA case in support of their argument that claims for monetary damages against them in their individual capacities are not supported by RFRA. <u>See</u> Jean Pierre v. BOP, 2010 WL 3852338 (W.D. Pa. July 30, 2010) (Report and Recommendation of Magistrate Judge Lisa Pupo Lenihan), <u>adopted by</u>, 2010 WL 3834872 (W.D. Pa. Sept.27, 2010) (Order of Judge Kim R. Gibson adopting Report and Recommendation). There are a number of reasons why that case does not entitle Defendants to dismissal of the RFRA claims against them in their individual capacities. First, that case is an unpublished case by a district court in the Western District of Pennsylvania and is not binding on this Court. Second, although the Report and Recommendation in a footnote indicates that there can be no damages liability against the defendants in that case in their individual capacities, the Report and Recommendation does not actually recommend dismissal of the damages claim against the defendants in their individual capacities. Instead,

the Report and Recommendation recommends only that the motion to dismiss in that case be granted as to the Bureau of Prisons and as to the individual defendants in their official capacities. The Order adopting that Report and Recommendation also only dismisses the claims against the Bureau of Prisons and against the defendants in their official capacities. Third, the Report and Recommendation in that case contains no reasoning to support the contention that a damages claim against defendants in their individual capacities is not supported by RFRA. Instead, the Report and Recommendation cites the same six RLUIPA cases cited above by the defendants in this case. As set forth above, the reasoning of those RLUIPA cases is not applicable to a RFRA case.

The cases cited by Defendants do not support their contention that RFRA does not provide for damages against defendants in their individual capacities. Defendants also have not presented any argument or reasoning to support their contention that RFRA does not provide for damages against them in their individual capacities. As a result, Defendants are not entitled to dismissal of the RFRA claims against them in their individual capacities.

E. **Religious Freedom Restoration Act**

The First Amendment provides that "Congress shall make no law respecting

-14-

an establishment of religion, or prohibiting the free exercise thereof; ..." U.S. Const. Amend. I. It is undisputed that prisoners do not entirely forfeit all constitutional guarantees by reason of their conviction and confinement. Bell v. Wolfish, 441 U.S. 520, 545 (1979). Prisoners, as is well recognized, must be afforded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment. Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972).

However, imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment's right to the free exercise of religion. Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987). Further, it is equally settled under Bell that "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547-48.

In a subsequent decision, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); see also O'Lone, 482 U.S. at 349 (reiterating the Turner standard as

the applicable test for prison regulations).  These interests include: "deterrence of crime, rehabilitation of prisoners, and institutional security."  O'Lone, 482 U.S. at 348.  This standard implies that a balancing test must be applied between the prisoner's claims and the prison's need of internal order and security.  In Turner, the court set forth four factors to consider in reaching a decision.  482 U.S. at 89-90.[3]

However, in 1993, Congress enacted the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq.  Section § 2000bb-1 specifically provides, in part, as follows:

§ 2000bb-1.  Free exercise of religion protected

(a)     In general
Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b)     Exception
Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the

---

3. They are: (1) is there a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it" (citation omitted), 482 U.S. at 89; (2) does the prisoner have alternate means of "exercising the right that remain open to prison inmates", Id. at 90; (3) what "impact" would "accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison resources generally," Id.; and (4) what "ready alternatives" to the prison regulation exist.  Id.

person --
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1.  The RFRA expressly provides that its stated purpose is:

> (1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
> (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b)(1), (2).

The RFRA applies to free exercise claims under the First Amendment brought by prisoners.  Small v. Lehman, 98 F.3d 762, 768 (3d Cir. 1996); Austin v. Guarini, Civil Action No. 95-5447, 1997 WL 47566, *6 (E.D. Pa. Feb. 3, 1997); Robinson v. Klotz, Civil Action No. 94-1993, 1995 WL 27479, *7 (E.D. Pa. Jan. 23, 1995); Boone v. Commissioner, Civil Action No. 93-5074, 1994 WL 383590, *7 (E.D. Pa. July 21, 1994).

A challenged restraint on the freedom of religion does not fall within the

scope of the RFRA, however unless the inmate can establish that a "substantial

burden" is placed on his or her ability to exercise said freedom.  <u>Small</u>, 98 F.2d at

767.  In addressing the issue of what an inmate must show in order to establish a

substantial burden under the RFRA, the Third Circuit stated in <u>Washington v. Klem</u>,

497 F. 3d 272 (3d Cir. 2007), a substantial burden exists where:

> 1) a follower is forced to choose between following the precepts of
> his religion and forfeiting benefits otherwise generally acceptable to
> other inmates versus abandoning one of the precepts of his religion
> in order to receive a benefit; or
>
> 2) the government puts substantial pressure on an adherent to
> substantially modify his behavior and to violate his beliefs.

<u>Washington</u>, 497 F.3d at 280.  This standard is consistent with the standard applied

in pre-act First Amendment free exercise decisions.  <u>See</u> <u>Thomas v. Review Bd.</u>, 450

U.S. 707, 717-18 (1981) (noting that a burden exists when state's regulation places

". . . substantial pressure on an adherent to modify his behavior and to violate his

beliefs . . ."); <u>Graham v. Commissioner</u>, 822 F.2d 844, 851 (9th Cir. 1987) ("This

interference must be more than an inconvenience; the burden must be substantial

and an interference with a tenet or belief that is central to religious doctrine."

(Citations Omitted)), <u>aff'd sub nom.</u> <u>Hernandez v. Commissioner</u>, 490 U.S. 680

(1989).

Moreover, under pre-RFRA First Amendment free exercise case law, a particular belief had to be shown to be (1) sincerely held, and (2) religious in nature before the First Amendment free exercise protections were deemed applicable. Wisconsin v. Yoder, 406 U.S. 205, 215-19 (1972); Thomas, 450 U.S. at 713-18; Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981), cert. denied, 456 U.S. 908 (1982).  Since the passage of the RFRA, it has been held that this threshold showing is still required in first amendment free exercise claims.  Werner v. McCotter, 49 F.3d 1476, 1479 n.1 (10th Cir. 1995), cert. denied, 515 U.S. 1166 (1995) ("Under Yoder, a plaintiff must make two threshold showings to state a prima facie free exercise claim.  As the Act (RFRA) makes express reference to the Yoder standard, we see no reason not to read these threshold requirements into the statutory right created by the Act."); see also Muslim v. Frame, 891 F. Supp. 226, 231 (E.D. Pa. 1995) ("[A] plaintiff's burden under RFRA is satisfied by a showing that the government has placed a substantial burden on a practice motivated by a sincere religious belief.").  It is only once a substantial burden on religion has been established by the prisoner, that the government must then establish "that it has a 'compelling interest' in its actions and is furthering that interest by the 'least restrictive means.'"  Small, 98 F.3d at 767. (Citations Omitted).

-19-

Applying the principles set forth above, it is plain that Plaintiff cannot demonstrate a substantial burden on the exercise of his religion from the challenged policies.  Moreover, any burden is justified by compelling governmental interests furthered through least restrictive means.

### 1.  <u>Group Prayer/Chapel Use Scheduling</u>[4]

Plaintiff claims that from August 2006 through May 2009, at USP-Lewisburg, Defendants Williamson, Lappin and Kelly violated his First Amendment rights by refusing to make the religious services department, which he refers to as the RSD, available so that "all general population Muslims" can perform all their daily prayer obligations "all together as one group." (Doc. 27, amended complaint at 6).  He states that these defendants should permit Muslims to leave their "work details, classes, recreation areas and housing units to do so." Id.

Garraway claims this issue continued from June 2009 to present at USP-Canaan when Defendants Lappin, Holt, Dunbar, Mrad, Johnson and Sorenson did not make the chapel available for all Muslims to perform all their prayers together as one group. Id. at 11.  Plaintiff also provides a list of restrictions he

_____

4. (See Doc. 27, Amended Complaint at Claim 1, ¶ 21, Claim 18, ¶ 38, Claim 19, ¶ 39, Claim 20, ¶ 40, Claim 30 ¶ 49a).

alleges Warden Holt placed on Muslim congregational prayer. Id. He notes that congregational prayer was not permitted on the recreational yard, that inmates had to obtain permission from their work supervisors before performing congregational prayer and limiting prayer in the housing units to a maximum of two inmates in a cell, which was the only permissible area in the housing unit. Id.

The Plaintiff believes that he should not have to "seek the permission of his work detail supervisors" before performing prayer. Id. at 12.

At both USP-Lewisburg and USP-Canaan, Muslim inmates are afforded religious freedoms in accordance with BOP policy. Bureau of Prisons' Program Statement 5360.09.7.a, provides that:

> The level of scheduled activities is expected to be commensurate with the institution's mission/need. Authorized congregate services will be made available for all inmates weekly with the exception of those detained in any Special Housing Units (SHUs). If a state of emergency exists (e.g. fog, institution lock down, food strike), the warden or designee will determine the appropriate level of chapel programming.

(Doc. 39-1, Ex. 1, Att. B, Program Statement 5360.09).

At both USP-Lewisburg and USP-Canaan, Muslim inmates were/are permitted to perform their daily five prayer obligations in their cells, at their work assignments or educational assignments (in areas arranged by their supervisors).

(Doc. 39-1, Ex. 1, Declaration of Kevin Kelley, Supervisory Chaplain at USP-Lewisburg at ¶ 6; Ex. 2, Declaration of John Johnson, Supervisory Chaplain at USP-Canaan at ¶ 3).  In the interest of inmate accountability, work supervisors must be notified when inmates are leaving one area to go to another area, for prayer or other reasons.  Id.

Both institutions limit inmates, when outside the chapel area, to two inmates participating in group demonstrative prayer.  Id.  USP-Lewisburg previously allowed three inmates to "group" outside the chapel, but this number was reduced after incidents of inmates blocking hallways and other areas and not allowing staff and other inmates to pass through. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 7). Inmates are not permitted to participate in demonstrative prayer groups in the recreation yard or in housing unit activity rooms.   (Doc. 39-1, Ex. 2, Johnson Dec. at ¶ 6; Doc. 50-3, Plaintiff's statement of material facts at ¶ 9).

Muslim inmates at both institutions may attend the Jumah prayer service each Friday afternoon as a community in the institution chapel area.  (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 7; Ex. 2, Johnson Dec. at ¶ 4).

Both institutions offered other scheduled "Muslim study" periods which Muslim inmates may attend as a group in the chapels, and USP-Lewisburg offered a

second Muslim prayer period which could be attended as a group. Id.

Both institutions permit inmates to use chapel space on a "first come, first served" basis when the chapel was not in use for other pre-scheduled events. Id. Inmates may utilize chapel resources such as videos, or listening to CDs, as well as other activities during these times. Id. Inmates may not utilize chapel resources during community prayer time in the chapel. (Doc. 50-3, Plaintiff's statement of material facts at ¶ 6).

Both institutions also offer extra, special accommodations during Ramadan (extra group prayer times, religiously significant foods), and also provide Muslim inmates with a ceremonial meal. (Doc. 39-1, Ex. 1, Att. A, Religious Services Schedule).

USP-Lewisburg and USP-Canaan have developed their chapel schedules to service a wide variety of religious needs among a high security inmate population, taking into account both space within the chapels and available staff supervision. Id. Designating areas for inmates to pray outside the chapel and limiting the number of inmates who may group together in non-chapel areas is in response to security concerns regarding inmate tensions which may erupt if praying inmates block hallways and other areas. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 7).

Applying the <u>Turner</u> analysis to Plaintiff's claims regarding institution policy:

1.    Is there a legitimate rational connection between the prison regulation and the governmental interest?

The legitimate governmental interest behind BOP religious policies is the need to maintain institutional order and security.  We find that there clearly is a rational connection between requiring that inmates stay out of unauthorized areas of prayer, i.e., the recreational yard,  and obey orders and maintaining order and security in an institution.  As is evident from the policies, both institutions have developed their chapel schedules to service a wide variety of religious needs among a high security inmate population, taking into account both space within the chapels and available staff supervision.  Designating areas for inmates to pray outside the chapel and limiting the number of inmates who may group together in non-chapel areas is in response to security concerns regarding inmate tensions which may erupt if praying inmates block hallways or other areas.  Defendants have demonstrated that prohibiting prayer on the recreation yard at USP-Canaan is in response to the special security concerns of that crowded area.  As such, we observe that the BOP policies are neutral in that they apply to all inmates and are enforced regardless of

-24-

the reasons why they fail to obey orders or are present in unauthorized areas.

      2.     Is Plaintiff afforded an alternative means of exercising
              the constitutional right at hand?

Both USP-Lewisburg and USP-Canaan have implemented several ways to accommodate Plaintiff's Muslim beliefs and practices regarding prayer. Plaintiff is permitted to engage in individual daily prayer and is also allowed to participate in group prayer as a community at Jumah prayer every Friday. He is also allowed to pray in groups of two at his worksite or education assignment as long as he practices in the area assigned for this activity. He has various other opportunities during the week to congregate with other members of his religious community both in the chapel and in his cell.

Additionally, both institutions offer other scheduled "Muslim study" periods which Muslim inmates may attend as a group in the chapels, and USP-Lewisburg offers a second Muslim prayer period which could be attended as a group.

      3.     What is the impact that accommodation of the
              constitutional right would have on other prisoners,
              staff and prison resources in general?

In this case, Garraway has not alleged that BOP policy inhibits his ability to practice his religion generally. For example, he does not claim that he is not able to

participate in group worship or offer prayer in the prescribed manner in his cell.

Moreover, the current chapel schedules balance the needs of a diverse inmate population. (See Doc. 39-1, Attach. A, Chapel schedule).   The accommodation of any one religious group's request to disproportionately monopolize chapel resources poses a security risk.  Staff are responsible for supervising the inmates assigned to their work details.  Allowing inmates to leave their work assignment to go to another area without notifying their supervisor would violate inmate accountability obligations and create security concerns.  Prayer on the recreation yard presents a unique security risk given the number of inmates in that area.  Prayer in that area "poses a security risk, because such activity, which involves chanting, calling or body movements, could easily disrupt the recreation activities of other inmates."  Withrow v. Bartlett, 15 F. Supp. 2d 292, 297 (W.D. NY 1998).

To the extent that Plaintiff believes that he should not have to "seek the permission of his work detail supervisors" before performing prayer, if, for example, Muslim inmates were permitted to choose any area they deem appropriate for offering prayer, it would be logistically impossible for prison staff to monitor the whereabouts of inmates at any given time in order to maintain security within the

-26-

prison. The same is true if inmates were permitted to leave their work assignment area to return to their cells to pray. Prison staff would necessarily need to monitor their trips back and forth. Moreover, if, for example, a policy were enacted whereby Muslim inmates would be permitted to ignore staff orders merely because they are praying, disorder would ensue as other non-Muslim inmates challenged the fairness of such a policy and/or acted out in protest against such a policy either generally or against Muslim inmates.

4.    The availability of alternatives.

Defendants' submissions demonstrate that Garraway's suggestion that all Muslim inmates be permitted to conduct all their daily prayers, as well as Ramadan prayers in the chapels, and/or to pray on the rec yard would significantly affect legitimate interests in maintaining security of these institutions. However, in light of the other options offered, Garraway has failed to demonstrate a need for additional accommodations with regard to group prayer issues.

It is undisputed that courts have recognized the importance of congregational prayer. Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989), cert denied, 492 U.S. 909 (1989). However, a prisoner's right to practice his religion is not absolute. Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) cert denied,

-27-

498 U.S. 951(1990).

The Supreme Court has stated that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." Cruz v. Beto, 405 U.S. 319, 322 n. 2(1972).  The United States Court of Appeals for the Third Circuit echoed this when they said, "[t]he requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice." Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970).  Although the Court of Appeals later stated that "an opportunity to worship as a congregation by a substantial number of prisoners may be a basic religious experience and, therefore, a fundamental exercise of religion by a bona fide religious group," Small v. Lehman, 98 F.3d 762, 768 (3d Cir. 1996), they have never indicated, let alone clearly established, that a single prisoner or a non-substantial number of like-minded prisoners are entitled to place on the state the burden of furnishing separate religious services for them.

Thus, Garraway fails to show how these restrictions burden his practice of

his religion.  None of the policies in place at either USP-Lewisburg, nor USP-Canaan force him to choose between his religion and a benefit nor do they force him to modify his beliefs.  As such, the Court finds that such restrictions do not run afoul of RFRA either.

### 2. **Full time Muslim Chaplain**[5]

Garraway claims that Defendants at both USP-Lewisburg and USP-Canaan, violated his First Amendment rights "by refusing to provide a full-time Sunni Muslim chaplain staff trained in [his] Islamic faith while providing two to three (Kelley, Jones, Irizzary) Christian chaplains for Christian inmates." (Doc. 27, at pp. 6, 14).

Both USP-Lewisburg and USP-Canaan utilized the services of Muslim volunteers during the relevant time periods.  (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 8; Ex. 2, Johnson Dec. at ¶ 7).  USP-Canaan also utilized the services of a BOP staff member who is a Muslim Imam who works at the Federal Detention Center in Philadelphia.  Id.  Both institutions continue efforts to recruit qualified Muslim volunteers and/or chaplains.  Id.

---

5. (See Doc. 27, Amended Complaint at Claim 2, ¶ 22, Claim 24, ¶ 44).

The Free Exercise Clause guarantees substantive right but does not guarantee that all religious sects will be treated alike in all respects. See Cruz v. Beto, 405 U.S. 319 (1972). While prisoners must be given reasonable opportunity to exercise their faith, the Constitution does not require that a religious adviser be provided to cater to every sect/sub-sect in the penitentiary, nor does the Constitution require that prisoners be provided with a religious adviser of their choice or with the one belonging to their unique religious sect/sub-sect (or sharing their unique religious views). See Blair–Bey v. Nix, 963 F.2d 162 (8th Cir. 1992), cert. denied, 506 U.S. 1007(1992); see also Allen v. Toombs, 827 F.2d 563, 569 (9th Cir. 1987) (a prisoner is not entitled to have the clergyman of his choice provided for him in the prison); Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970) (same); see also Pogue v. Woodford, 2009 U.S. Dist. LEXIS 75943 at *8 (E.D. Cal. 2009) (only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are violated) (citing SapaNajin v. Gunter, 857 F.2d 463, 464 (8th Cir. 1988). Garraway has not made this claim, therefore, it is not necessary to pursue the Turner analysis in detail, nor can it be said that he has been forced to alter his beliefs, creating a "substantial burden" under RFRA. Defendants'

submissions reveal that all available qualified Muslim volunteers and chaplains are utilized and efforts continue to locate additional qualified individuals.   Thus, Plaintiff's claim is to be dismissed accordingly.

### 3. **Delay in Receiving Mail**[6]

Garraway claims that Defendants violated his First Amendment rights by "implementing policies which illegally obstruct [his] incoming mail (i.e., Islamic books) for 3 to 4 weeks in order to read, scrutinize, and record the titles of Islamic books purchased by Muslim inmates." (Doc. 27, Amended complaint at p 7).

Defendants maintain that neither institution has/had any policy in effect to delay the Plaintiff's mail or any Islamic religious material generally and none of the Defendants noted in this claim personally processed mail, although Defendant Kerstetter supervised mailroom staff at USP-Lewisburg.  (Doc. 39-1, Exs. 1, 2, Kelley and Johnson Declarations).

However, even accepting Plaintiff's allegation as true, a prison policy which would screen incoming publications for contraband is clearly a legitimate one,

---

6. (See Doc. 27, Amended Complaint at Claim 3, ¶ 23).

meant to serve the purpose of reducing prison contraband.[7]  In the interim, while

Plaintiff waited for his publications, it is clear from the record that he had other,

alternative means of exercising his religious faith.  As noted in the declarations of

Defendants Kelley and Johnson, the administration of USP-Lewisburg and USP-

Canaan encourages inmates to practice their religion and accommodates their needs

by making religious services available, permits the wearing of religious medals,

affords inmates the right to freedom of religious affiliation and voluntary religious

worship, provides special religious needs diets, makes a chaplain available and

grants access to religious materials and books through the chaplain and through the

onsite library.  (See Doc. 39-1, Exs. 1, 2, Kelley and Johnson Declarations).

While Garraway denies that inmates' religious needs are accommodated at

these two institutions, he does not come forth with any evidence of record to support

his position.  Thus, while a three (3) to four (4) week delay is undoubtedly a burden,

Garraway does not demonstrate that the prison policy resulted in a substantial

_____

7. A similar policy was held to be constitutional by the Supreme Court in Bell v.
Wolfish, 441 U.S. 520, 548-55 (1979); see also Hurd v. Williams, 755 F.2d 306 (3d
Cir. 1985).

burden under the RFRA and <u>Washington</u>.  At no point did Garraway have to abandon one of the precepts of his Muslim religion, nor did the government put pressure on him to substantially modify his behavior or violate his beliefs. Accordingly, Defendants are entitled to an entry of summary judgment on this claim.

### 4. **Religious Diet**[8]

Plaintiff claims that "from Aug 2006 to May 2009, at U.S.P. Lewisburg, Kelley, Lappin, Rogers, and Williamson violated [his] First and Eighth Amendment rights by providing [him] with unhealthy, unlabelled greasy, cholesterol and fat laden scraps of meat and other foods with the so called certified foot diet." (Doc. 27, Amended Complaint at p. 7).  Plaintiff further claims that Defendants violated his First Amendment rights "by refusing to provide an Islamic Halal food diet for 100 to 150 Muslims while providing Kosher foods for 2 to 3 Jews. <u>Id.</u>  Finally, Plaintiff claims that "from June 2009 to present, at U.S.P. Canaan, Lappin, Holt, Diehl, and Gundrum violated [his] First Amendment rights by issuing a nutritionally inadequate, high sodium, unlabeled, fat/cholesterol laden kosher diet for 4 to 5 Jewish inmates but refuses to issue an Islamic Halal food diet to well over 150

---

8. (<u>See</u> Doc. 27, Amended Complaint at Claim 4, ¶ 24, Claim 5, ¶ 25, Claim 27, ¶ 47).

Muslim inmates." Id. at p. 14.

BOP policy, as codified at 28 C.F.R. § 548.20, provides:

The Bureau provides inmate requesting a religious diet reasonable
and equitable opportunity to observe a religious dietary practice
with the constraints of budget limitations and the security and
orderly running of the institution and the Bureau through a religious
diet menu.

All religious diets are provided in accordance with BOP policy. (Doc. 39-1,

Exs. 1, 2, Kelley and Johnson Declarations).

Currently, the religious diet approved throughout the Bureau of Prisons is

the Alternative Diet Program, which consists of two separate components: the

no-flesh component on the main line; and, the religiously certified processed foods

component. (Doc. 39-1, Ex. 1 Kelley Dec. at ¶ 10; Johnson Dec. at ¶ 8).   The

no-flesh option is provided at both the noon and evening meals whenever an entrée

containing flesh is offered.   (Doc. 39-1, Ex. 1 Kelley Dec. at ¶ 11).  Vegetables and

starches seasoned with flesh will have an alternate no-flesh option.  Id. The certified

food component (kosher) is a nationally approved certified food menu, which is

served to all inmates who are approved to participate in the certified food

component diet. (Doc. 39-1, Ex. 1 Kelley Dec. at ¶ 11; Johnson Dec. at ¶ 9).  The

meals are served to inmates in the double wrapped containers provided by the

vendors.  Id.  They are not, nor are they required to be individually labeled.  Id.

Inmates have a constitutional right to receive a nutritious diet consistent with their religious beliefs.  Johnson v. Horn, 150 F.3d 276, 283 (3rd Cir. 1998) (holding that the First Amendment requires prison officials to provide inmates "with a diet sufficient to sustain them in good health without violating [religious] laws") (citations omitted).  However, as set forth above, the right to practice one's religion while in prison is not absolute.  See O'Lone v. Shabazz, 482 U.S. 342, 348 (1987) (free exercise rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or maintain prison security.")

Again, "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89.  Applying the Turner analysis to Plaintiff's claims regarding institution policy:

> 1.   Is there a legitimate rational connection between the prison regulation and the governmental interest?

Religious diet programs implemented in accordance with BOP policy at USP-Lewisburg and USP-Canaan are solely to ensure that inmates who are

approved for religious certified meals, are served meals that did not violate their

religious tenets. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 11; Ex. 2, Johnson Dec. at ¶ 9).

The BOP purchases a kosher diet, because kosher standards meet (and exceed) Halal

standards. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 12; Id.) The standards the food must

meet are controlled for both religious and nutritional specifications.  Id.

      2.     Does the plaintiff have alternative means of exercising
            the constitutional right at hand?

Garraway can request approval to participate in the no-flesh religious diet,

or he could make purchases from the commissary that he deems appropriate.

      3.     What is the impact that accommodation of the
            constitutional right would have on other prisoners,
            staff and prison resources in general; and
      4.     the availability of alternatives to the regulation.

As set forth above, Garraway's constitutional rights are being

accommodated.  To offer a wholly separate Halal diet, in addition to offering

Kosher meals, would not be cost effective, nor would it necessarily be beneficial.

Kosher meals are nationally recognized by Orthodox Standards and are served

prepackaged. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 12-13).  Guidelines regarding

kosher items certainly meet the Halal standard of observing Muslims. (Id; Ex. 2,

Johnson Dec. at ¶ 9).  To the extent that Garraway is complaining about the quality

-36-

of the products he receives, in light of the other options offered, Garraway has failed to demonstrate a need for alternatives with regard to diet provision issues, and has failed to allege that his religious beliefs are being burdened in any manner, let alone substantially.

Prior to January of 2006, the United States Court of Appeals for the Third Circuit considered constitutional challenges to prison officials' failure to accommodate the dietary restrictions of Sunni Muslims and Buddhists, and held that both challenged food policies passed constitutional muster. In Williams v. Morton, the Third Circuit considered, and rejected, a Free Exercise claim challenging the provision of vegetarian meals to Muslim inmates, who requested the addition of Halal meat. Analyzing the prisoners' constitutional claims under the four-part test enunciated by the Supreme Court in Turner, supra, the Court held that (1) the provision of vegetarian meals, rather than Halal meals with meat, is rationally related to the legitimate penological interests in simplified food service, security, and budget, (2) that Muslim prisoners have various ways, other than eating the desired Halal meals with meat, to practice their religion, (3) that providing Halal meat meals to a substantial number of Muslim prisoners would have a marked effect on the prison community, and (4) the cost of providing Halal meat meals is not de

-37-

minimis and so is not a ready alternative to vegetarian meals.  343 F.3d 212 (3d Cir. 2003).

Similarly, in DeHart v. Horn, 390 F.3d 262 (3d Cir. 2004), a Mahayana Buddhist inmate alleged that his constitutional rights were violated by prison officials' refusal to provide him with a religiously appropriate diet.  Again, the Third Circuit conducted a thorough reasonableness analysis under Turner and concluded that the decisions of the prison officials were not violative of the First or Fifth Amendments.  Id.  This is in keeping with the decisions from around the country: "[T]he majority of circuit and district courts that have looked at this specific issue have concluded there is no such clearly established right to Halal meals, with or without Halal meat, under the First Amendment's Free Exercise of Religion Clause, RLUIPA or the Equal Protection Clause of the Fourteenth Amendment."  Thompson v. Williams, 2007 WL 3244666 at *22 (W.D. Wash. Oct.31, 2007), citing, inter alia, Williams v. Morton, 343 F.3d 212, 216–22 (3d Cir. 2003); Cochran v. Schotten, 172 F.3d 47 (6th Cir. 1998); Bilal v. Lehman, 2006 WL 3626808 at *6–7 (W.D. Wash. Dec. 8, 2006) (finding lack of clearly established law regarding Muslim inmate's right to a diet specifically including Halal meat); Pratt v. Corr. Corp. of America, 267 Fed.Appx. 482 (8th Cir. 2008) (prison not required to provide diet with Halal

-38-

meat where other Halal food was provided); <u>Patel v. United States Bureau of Prisons</u>, 515 F.3d 807 (8th Cir. 2008) (BOP not required to provide Halal meals); <u>Jihad v. Fabian</u>, 2011 WL 1641885 at *15 (D.Minn. Feb.17, 2011) (finding no clearly established right to prepackaged Halal meals based on religious beliefs). Thus, Defendants are entitled to summary judgment as to this claim.

### 5. Dress/Clothing Issues[9]

Garraway complains that BOP Director Lappin violated his First Amendment rights through a BOP policy prohibiting Muslim inmates from hemming or wearing their pants above their ankle. (Doc. 27, Amended Complaint at p. 7). He further states that "from June, 2009 to present, at U.S.P. Canaan, Holt and Diehl have violated my First Amendment rights by denying me the ability to purchase with my own money, via special order, religious clothing (Kurta shirts, jalabiyyas) and wear such clothing in RSD and in housing units." (Doc. 27, Amended Complaint at p. 13). Finally, Garraway alleges that BOP Director Lappin violated his rights by "permitting BOP staff to implement the use of 'Kufi cards' which Muslims must carry as permission to wear Kufis." <u>Id.</u> at 15.

---

9. (<u>See</u> Doc. 27, Amended Complaint at Claim 6, ¶ 26, Claim 21, ¶ 41, Claim 29, ¶ 49).

Bureau of Prisons' Program Statement 5360.09, provides for inmates ordinarily to be allowed to use or wear personal religious items during religious services and ceremonies, and meetings in the chapel, unless there is a specific security concern to disallow it. (Doc. 39-1, Ex. 1, Att. B, P.S. 5360.09). Policy also provides for the Warden to allow certain items to be worn or used outside the chapel, consistent with institution security. Id. While at both USP-Canaan and USP-Lewisburg, Garraway was/is permitted to wear a Kurta shirt in accordance with BOP policy, during the weekly Jumah prayer service. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 16; Att. B at 14; Ex. 2, Johnson Dec. at ¶ 11). Policy states this item may not be worn on the compound or in the housing units or visiting room. Id. Likewise, policy states that Islamic inmates may not hem or wear their pants above their ankles. Id. The issuance of uniform clothing for inmates is an important aspect of institutional security. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 17; Ex. 2, Johnson Dec. at ¶ 12). Uniform clothing facilitates staff performing pat searches of inmates to ensure inmates are not carrying or concealing contraband, which is more easily hidden in baggy clothing. Id. Requiring uniform dress supports the premise that all inmates are treated equally, and does not give the appearance of any particular sanctioning of any group or religious belief. Id.

-40-

Program Statement 5360.09, p. 12, states with regard to religious headwear, "A standard color and style generally eliminates the necessity for the religious headwear permit cards. The cards are discouraged because of the perceived connotation of the religious discrimination and/or violation of religious freedom and privacy." (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 18). Neither USP-Lewisburg, nor USP-Canaan requires/required the use of Kufi cards. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 18; Ex. 2, Johnson Dec. at ¶ 13).

Applying the Turner analysis to Plaintiff's claims regarding institution dress/clothing policy:

1.     Is there a legitimate rational connection between the
       prison regulation and the governmental interest?

BOP policy permits inmates to wear some items of clothing required by or religiously significant to their religious beliefs in the chapel area. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 15). These items are not permitted to be worn outside of the chapel for security reasons (potentially facilitating contraband concealment) and to avoid the appearance of perceived favoritism or government sanction of a particular group. (Id at ¶ 12, 17; Ex. 2, Johnson Dec. at ¶ 12); See also Goldman v. Weinberger, 475 U.S. 503, 506-07 (1986) (recognizing military's legitimate interests in uniformity of

-41-

dress for purpose of obedience and structure). The requirement for uniform color

and style of Kufi is based on the same reason stated above. (Id. at ¶ 18).

Moreover, concerns for group distinction have become particularly great

with the significant number of gang members present in the prison population. See

Young v. Lane, 922 F.2d 370, 375 (7th Cir. 1991) (recognizing concern for

headwear and gang identification); Sasnett v. Sullivan, 908 F. Supp. 1429,

1444(W.D. Wis. 1995) (recognizing legitimate prison concern with gang

identification). Thus, the prison requires uniform dress, restricting individual

expression, in part, precisely to minimize any perception of favored treatment and to

prevent the development of inmate distinction that could be used to reflect an

internal power structure within the inmate population. See O'Lone v. Estate of

Shabazz, 482 U.S. 342, 352-53 (1987) (recognizing that special treatment to one

prison group would create problems with other groups); Young, 922 F.2d at 377

(recognizing negative ripple effect of allowing special treatment in prison setting).

2.    Does the plaintiff have alternative means of exercising
      the constitutional right at hand?

Because Garraway does not specifically allege how his constitutional right

to practice his religion is being violated by the above restrictions, he has not

stated a claim for a "substantial burden." He is permitted to wear an approved style and color Kufi without carrying a "kufi card." He is permitted to wear a religiously significant garment while he is in the chapel participating in religious ceremonies.

3.     What is the impact that accommodation of the constitutional right would have on other prisoners, staff and prison resources in general?

Requiring the BOP to allow Muslim inmates (or inmates of any other sect requesting to wear religious ceremonial clothing) to wear these items outside of the chapel creates a security risk for contraband concealment and inmate recognition to facilitate escape attempts. It also creates a security concern by giving the appearance of government sanction of a particular sect or practice. Id.

4.     Alternatives to the regulation.

As the current dress code policy imposes no "substantial burden" on Plaintiff's ability to practice his religion, Garraway has failed to demonstrate a need for alternatives with regard to religious clothing provision issues.

**6. Withholding/Limiting Islamic Media**[10]

---

10. (See Doc. 27, Amended Complaint Claim 7a) thru f), ¶ 27, Claim 14, ¶ 34, Claim 17, ¶ 37, Claim 23, ¶ 43, Claim 26, ¶ 46.

Garraway claims that he has been prevented from purchasing or possessing, "How to Build a Muslim Household" cassette tapes, "Why We Should Be Muslims" tape, "Noble Qur'ans containing an appendix which explains Jihad" and "Ahmed Deedat videos." (Doc. 27, Amended Complaint at p. 8). He further claims that Defendants, at both USP-Lewisburg and USP-Canaan have violated his constitutional rights by limiting him to five "personally owned Islamic books" he could receive through the mail and retain as personal property, (id. at pp. 10, 14) and refusing to "release federal money" to subscribe to an Islamic newspaper. Id.

The BOP provides certain central religion texts to inmates free of charge. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 20; Ex. 2, Johnson Dec. at ¶ 15). An inmate may be given a free copy of a Bible or a Koran from the chaplain. Id. There are many versions of English translation of both the Bible and the Koran. Id. The Bureau provides one of the available and accepted translations. Id. If an inmate wishes to purchase an alternative translation of another version of one of these texts, he may do so privately, subject to the BOP's rules on all incoming publications. Id.

BOP Program Statement 5580.07, Inmate Property, provides the limits on

-44-

personally owned items an inmate may transfer from one institution to another.

(Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 23; Att. A, P.S. 5580.07). Because inmates may

be transferred at any time, most institutions subscribe to the same limits. Id. Per the

national limit, inmates may have five books (hard/soft cover) in their personal

property, this limit is not topic-specific, but deals with any books. Id. Limitations

on inmate property are imposed in the interest of institution security, fire safety and

sanitation. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 24; Ex. 2, Johnson Dec. at ¶ 17).

Limitations on property facilitate staff obligations to do proper cell searches, and

limit the places inmates may store contraband. Id. Books are a place where

contraband is frequently found, put in the bindings, and in "hollowed-out" pages.

Id.

Chaplain Kelley did not use BOP funds to subscribe to any periodical.

(Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 25). Any available periodicals were donated by

private sources in compliance with BOP donation procedures. Id. Inmates were

permitted to purchase or subscribe to religious periodicals in accordance with

Program Statement 5266.10, Incoming Publications. (Doc. 39-1, Ex. 1, Att. D, P.S.

5266.10).    Garraway does not specifically allege how his constitutional rights to

practice his religion are being violated by the above restrictions. On the contrary,

he can obtain a free Koran from the institution chaplain, or choose to personally order a different translation version if that is his preference.  He may maintain five (5) books of his choice on any topic, and has access to other books and media in the chapel area.  He may also personally subscribe to a religious periodical by following the subject neutral policy on incoming publications.  Requiring the BOP to expand inmate property limitations creates a security risk for contraband concealment, burdens staff in the conducting of proper cell searches and creates a fire safety and sanitation problem.  The Court finds that these policies violate neither the RFRA nor the First Amendment.

In Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007), the United States Court of Appeals for the Third Circuit found that a prison's restriction of the number of books possessed by an inmate could create a substantial burden on the inmate's practice of religion.  In that case, however, the plaintiff believed that his religion required him to read four (4) books per day, and the prison regulations only allowed him to exchange ten (10) books a week.  Id.  Reversing a grant of summary judgment for the defendant, the Court of Appeals found that the restriction did create a substantial burden on the plaintiff's practice of his religion.  Id.

In this case, Plaintiff does not establish that the prison's five-book limit or

the limitation on the amount of property he can keep in his cell or in storage creates

a substantial burden on his religious practice. Unlike the inmate in <u>Washington</u>, the

record before this Court does not demonstrate that Garraway's religion requires him

to have greater access to religious texts or materials. Nor has Garraway

demonstrated that he is forced to choose between forfeiture of benefits otherwise

generally available to other inmates or abandoning one of the precepts of his

religion in order to receive a benefit, or that the government put substantial pressure

on him to substantially modify his behavior and to violate his beliefs. Finally,

Plaintiff fails to demonstrate that the policy infringed on any expression of his

religion protected by the First Amendment.

### 7. Standardized Chapel Library

Garraway complains that BOP Director Lappin violated his constitutional

rights by "continuing to permit BOP Chaplains to maintain the BOP Standard

Chapel Library (Islamic) through the use of a different name (i.e., 'CLC')." (Doc.

27, Amended Complaint at Claim 8, ¶ 28). He further states that "on or about Mar-

Apr 2008, at USP-Lewisburg, inmate Carter returned an Islamic book to Irizzary to

be placed in the RSD library. However, Irizzary informed Carter that he had to

'check the BOP chapel Library Catalogue (CLC)' to see if the returned book had

prior BOP approval." Id.  Plaintiff concludes that "pursuant to federal law, the BOP was ordered to abolish any type of Islamic book list." Id.

Garraway has not provided any details to explain how the name of the Institution's Chapel Library constitutes a substantial burden on his religion. Moreover, to the extent that Plaintiff is attempting to bring a claim on behalf of inmate Carter, he lacks standing. See Brown v. Lindsay, 2009 WL 3241672 (M.D. Pa).  This claim will be dismissed.

### 8.  Prayer Oil/other ceremonial items[11]

Garraway states that "from Aug 2006 to May 2009, at U.S.C. Lewisburg, Kelley has violated [his] First Amendment rights by withholding Islamic religious ceremonial items (incense, prayer oils, fragrance oils) used to purify and perfume places of prayers", and by "illegally marking up prices on Islamic ceremonial items sold in the commissary" in violation of P.S. 4500.06.  (Doc. 27 at 9, 13).

Both USP-Lewisburg and USP-Canaan provide inmates with religious items free of charge when the items are received through a proper donation and are appropriate for distribution to inmates. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 27; Ex. 2,

---

11. (See Doc. 27, Amended Complaint at Claim 9, ¶ 29, Claim 10, ¶ 30, Claim 22, ¶ 42).

Johnson Dec. at ¶ 19).  Inmates have been given small amounts of prayer oil when a supply was donated.  <u>Id.</u>

Both USP-Lewisburg and USP-Canaan stock religious items in their respective commissaries.  (Doc. 39-1, Ex. F, Stock Status).  Pursuant to BOP Program Statement 4500.07, <u>Trust Fund/Deposit Fund Manual</u>, chapter 3, page 12, certain items stocked in the inmate commissary "have no mark up added to the cost...." religious items are sold in the respective commissaries, the cost of the item and the selling price of the item, showing no mark up. (<u>See</u> Doc. 39-1, Ex. 1, Atts. E-F).

Initially, the Court notes that Garraway does not allege that he is denied access to any of these items, rather he believes that he should be given them and not have to purchase them through the institution commissary.  In response, Defendants submit a copy of the BOP Stock Status, which indicates that scented oils are/were available for the inmates to purchase in the Commissary. (Doc. 39-1, Ex. F, Stock Status).  The mere fact that scented oil was subject to a "mark up" in the commissary did not place a substantial burden on Plaintiff's ability to practice his religion.  Accordingly, summary judgment should be granted in favor of Defendants with regard to this claim.

-49-

### 9.  Bible quotes

Garraway states that Defendant Kelley violated his First Amendment rights when he "allowed the preparation of bible quotes printed on small pieces of paper and permitted Christian inmates to distribute these quotes to both inmates and staff." (Doc. 27, Amended Complaint, Claim 11, ¶ 31).  He claims this was prohibited by BOP policy which does not permit "proselytizing." Id.

Once again, there is no indication as to how this practice specifically violated Plaintiff's constitutional rights, substantially burdened his practice of Islam or "promoted one religion over another."  He does not allege that he was forced to participate or to accept these "small pieces of paper" or that he was denied from printing something on a small piece of paper which represented his religion.  Thus, he fails to state a claim of constitutional magnitude.

### 10.  Allocation of funds

Garraway states that Defendant Kelley violated his First Amendment rights "by allocating more of the RSD budget and book shelves for Christian books." (Doc. 27, Amended Complaint at Claim 12, ¶ 32).  He further claims that Defendant Williamson "permitted the release of federal money to purchase binders, notebooks, paper, briefcases, office supplies, books, certificates, etc., for an inmate organized

planned and facilitated program called 'Men of Influence'", however, "Williamson refused to release federal money so that Sunni Muslims inmates could start a Muslim inmate facilitated program to address and eradicate extremism and radicalism among Muslim inmates." (Id. at Claim 16, ¶ 36 and Claim 25, ¶ 45).

The budget operation of the Religious Services Department is set forth in BOP Technical Reference Manual 5360.02, Ministry of BOP Chaplains, p. 31, Section 18 b), and provides, Equity in Funds Expenditures implies fairness rather than exact parity. (Doc. 39-1, Ex. 1, Att. G). Allocation of funds is based roughly on the size of the group, and the priority of requests made by groups. Id. One group may ask for books and receive them, while another group may request videos or some other items. (Doc. 39-1, Ex. 1, Kelley Dec. at ¶ 31). Chaplains try to establish equity in the amount of funds expended on what the group requests, not necessarily by buying the same amount of a specific item, i.e., books for each group. Id. Donations of religious items are frequently made to the religious services department. Id. There is not a large population of practicing Muslims in Central Pennsylvania and donations of Christian materials are more common. Id.

The "Men of Influence" group that Garraway references at USP-Lewisburg and USP-Canaan is not a religious organization and is not managed or funded by

the Religious Services Department. Id. at ¶ 32.  The Men of Influence group is a

non-denominational group which is offered as a program and is managed and funded

by the Psychology Department. Id.

The BOP has established a "Life Connections Program" which is currently

being piloted at six institutions.  (Doc. 39-1, Ex. 1, Att. H, Life Connections

Program).  The application process is set forth in the Operations Memorandum. Id.

Applying the Turner analysis to Plaintiff's claims regarding allocation of

funds:

> 1. Is there a legitimate rational connection between the prison
> regulation and the governmental interest?

The BOP's policy with regard to the allocation of funds for religious

services expenditures allows for flexibility for Religious Service administrators to

service a great variety of different inmate religious groups with vast differences in

membership numbers and religious item requirements.

> 2. Does the Plaintiff have alternative means of exercising the
> constitutional right at hand?

Garraway does not have a constitutional right to receive funds to start a

specific " Muslim inmate facilitated program to address and eradicate extremism

and radicalism among Muslim inmates."  He does not argue that starting this

program is a right or requirement of his religious beliefs, nor does he specify what

kind of funding this would require or how the funds would be used.

The program (Men of Influence) which Garraway uses as an example of

disparate treatment between Muslim and other faith groups is not a religious

services program, but rather is managed through Psychology Services, and is not

limited to any particular religious background.  Garraway's right to practice the

fundamental requirements of his religion are being accommodated as set forth in the

other sections of this brief.  Additionally, Garraway has access to several study

periods in the chapel during which issues related to "eradicating extremism and

radicalism among Muslim inmates" could be a topic.  He could also privately

discuss these issues with other inmates during other leisure activities or in his cell.

> 3. What is the impact that accommodation of the constitutional right
> would have on other prisoners, staff and prison resources in
> general; and

> 4. The availability of alternatives.

Although the right to receive funds to start a particular study group is not a

constitutional right; to the extent it could be construed as such, the BOP's allocation

of funds for religious services is based roughly on the size of the group, and the

priority of requests made by groups.  This allows for some individuality and input

from the various groups to work with Religious Services staff in prioritizing their

needs. To require funds be expended on a specific item or for a specific purpose,

such as funding the class Garraway requests would limit the autonomy of both the

Religious Services staff and other religious groups who are cooperating to manage

their available budgets. Further, Garraway has not provided enough information

regarding his proposed program for the Bureau to evaluate any possible security

concerns in its content.

With regard to the availability of alternatives, Garraway has access to

several study periods in the chapel during which issues related to "eradicating

extremism and radicalism among Muslim inmates" could be a topic. He could also

privately discuss these issues with other inmates during other leisure activities or in

his cell.

Thus, Plaintiff's subjective belief as to how BOP funds should be allocated

fails to demonstrate a substantial burden upon his exercise of religion. In so finding,

the Plaintiff has failed to demonstrate that starting a particular "Muslim inmate

facilitated program" is a right or requirement of his religious beliefs. Moreover, he

cannot demonstrate that the failure to provide him funds, forced Plaintiff to choose

between following the precepts of his religion and forfeiting benefits otherwise

generally available to other inmates. Nor did the denial of the funds pressure Plaintiff to substantially modify his behavior and to violate his beliefs. As such, this claim is without merit.

### 11. Teaching Arabic in Chapel

Garraway complains that he is not permitted to "teach Arabic" in the chapel at USP-Canaan. (Doc. 27, Amended Complaint at Claim 20, ¶ 40). Specifically, he states that "the Qur'an is recited in prayer and in order to recite the Qur'an correctly, it is necessary to learn the Arabic language as well as rules of recitation." Id.

BOP Program Statement 5360, Religious Beliefs and Practices, page 4, provides, "Inmates may recite formulaic prayers in the language required by their religion. Sermons, original oratory, teachings and admonitions must be delivered in English." (Doc. 39-1, Att. B, Program Statement 5360 at p. 4).

Applying the Turner analysis to this policy:

1. Is there a legitimate rational connection between the prison regulation and the governmental interest?

The BOP policy on restricting sermons, teaching, and some other religious communication be conducted in English is a safeguard to ensure that staff

understand the communications of inmates, and monitor them such that no

inappropriate communication, i.e., encouraging violence or any other inappropriate

action, is taking place. (Doc. 39-1, Ex. 2, Johnson Dec. at ¶¶ 23-24).  Permitting

inmates to pray in the language required by their religion satisfies their religious

obligation while BOP policy requiring sermons and other teachings to be delivered

in English maintains institution security by ensuring staff understand the

communication between inmates. (Doc. 39-1, Ex. 2, Johnson Dec. at ¶ 23-24).

> 2. Does the plaintiff have alternative means of exercising the constitutional right at hand?

Garraway may study Arabic in his cell.  Further, the Holy Qur'an, which is

the central book of the Muslim religion, containing its basic teachings and

principles, is provided by the BOP in both the Arabic language text and the English

translation.

> 3. What is the impact that accommodation of the constitutional right would have on other prisoners, staff and prison resources in general; and

> 4. The availability of alternatives.

The BOP policy on restricting sermons, teaching, and some other religious

communication be conducted in English is a safeguard to ensure that staff

understand the communications of inmates, and monitor them such that no inappropriate communication, i.e., encouraging violence or any other inappropriate action, is taking place. (Doc. 39-1, Ex. 2, Johnson Dec. at ¶¶ 23-24).  To require the BOP to permit these communications to take place in a language few, if any, staff would understand, would significantly affect legitimate interests in maintaining the security in these institutions. Id.  Thus, in light of the other options offered, Garraway has failed to demonstrate a need for additional accommodations with regard to his request to teach Arabic in the chapel, or that being unable to teach Arabic substantially burdens his religious practices.

### 12.  Participation in Muslim observances.

Garraway states that "from June 2009 to present, at U.S.P. Canaan, Lappin, Holt and Johnson violated [his] First Amendment rights by permitting non-Muslim religious sects and gangs to participate in Muslim Islamic observances (Ramadan fasts, Bid feasts) and by failing to implement strict accountability to prevent disrespect for my Islamic beliefs and practices." (Doc. 27 at Claim 28, ¶ 48).

BOP policy as codified at § 548.10(c), provides "The Bureau of Prisons does not require an inmate to profess a religious belief.  An inmate may designate any or no religious preference at his/her initial team screening.  By notifying the

chaplain in writing an inmate may request to change this designation at any time…." (Doc. 39-1, Ex. 1, Att. B, P5360.09 at 5-6). Policy further provides, "[t]o maintain the security and orderly running of the institution, and to prevent abuse or disrespect by inmates, the chaplain will monitor patterns of changes in the inmate's declarations of religious preference." Id. "In determining whether to allow an inmate to participate in a specific religious activity…staff may wish to refer to the information reported on the intake screening form and the inmate's religious preference history. Inmates showing 'No preference' or indicating membership in a different faith group may be restricted from participating in activities deemed appropriate for members only." Id.

Applying the Turner analysis to Plaintiff's claim regarding this policy:

1. Is there a legitimate rational connection between the prison regulation and the governmental interest?

The above cited policy allows staff to properly monitor inmate participation in religious activity while ensuring that inmates have equitable opportunities to pursue their religious beliefs. (Doc. 39-1, Ex. 2, Johnson Dec. at ¶ 25; Atts. A-B).

2. Does the plaintiff have alternative means of exercising the constitutional right at hand?

The above regulation does not limit Garraway from practicing his religion.

-58-

Rather, it simply provides staff (not inmates) with the authority to monitor participation in certain religious activities that may be appropriate for members of a particular group. Id.

> 3. What is the impact that accommodation of the constitutional right would have on other prisoners, staff and prison resources in general; and
>
> 4. The availability of alternatives.

Staff need to be cognizant of potential abuses of group meetings of inmates in any context. Id. at ¶ 26. It is not uncommon for inmate groups to try to exclude certain members/other inmates, and these types of actions can lead to serious disagreements and potential violence in a high security prison setting. Id. Accordingly, the authority must lie with staff members to evaluate and enforce an inmate's right to participate in certain activities, and not allow other inmates to determine who is and who is not an appropriate participant in a religious event. Id. at ¶ 27. Because this policy does not limit or affect Garraway's religious access, he has failed to demonstrate the need for alternatives.

## F.   **Bivens Standard**

Plaintiff's remaining claims are filed pursuant to 28 U.S.C. § 1331, in accordance with Bivens v. Six Unknown Named Agents of the Fed. Bureau of

Narcotics, 403 U.S. 388 (1971). Under Bivens, the District Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Bivens, supra. Pursuant to Bivens, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. § 1983 and the same legal principles have been held to apply. See, Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F.Supp. 1486, 1492 (M.D. Pa. 1992); Young v. Keohane, 809 F.Supp. 1185, 1200 n. 16 (M.D. Pa. 1992). In order to state an actionable Bivens claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law. See West v. Atkins, 487 U.S. 42, 48 (1988); Young v. Keohane, 809 F.Supp. 1185, 1199 (M.D. Pa. 1992); Sharpe v. Costello, 2007 WL 1098964, *3 (M.D. Pa. 2007).

### 1. **Rejection of Administrative Remedies**

Garraway complains that Defendant Strada rejected two of his

administrative remedy requests on February 20, 2008. (Doc. 27, Amended

Complaint at Claim 13, ¶ 33).  As this action was filed on August 13, 2010, this

particular claim is barred by the two year statute of limitations on the <u>Bivens</u> portion

of this amended complaint.  In any event, Defendants concede that Plaintiff

exhausted all administrative remedies.

Further, to the extent that Garraway seeks to impose liability against any

Defendant for their role in rejecting or denying his administrative grievances, they

are entitled to summary judgment, as it is well-established that prisoners have

no constitutionally protected right to a grievance procedure.  <u>See</u> <u>Jones v. North</u>

<u>Carolina Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 137-38 (1977) (Burger, C.J.,

concurring) ("I do not suggest that the [grievance] procedures are constitutionally

mandated."); <u>Wilson v. Horn</u>, 971 F.Supp. 943, 946 (E.D. Pa. 1997), <u>aff'd</u>, 142

F.3d 430 (3d Cir. 1998); <u>McGuire v. Forr</u>, 1996 WL 131130, at *1 (E.D. Pa. March

21, 1996), aff'd, 101 F.3d 691 (3d Cir. 1996); <u>McGlory v. Vermiere, et al.</u>, No.

3:CV-06-2279, slip op. at fn 9 (M.D.  Pa. August 8, 2007) (Nealon, J.) ("Warden

Miner is entitled to summary judgment in that it is well-established that prisoners

have no constitutionally protected right to a grievance procedure").  While

prisoners do have a constitutional right to seek redress of their grievances from the

government, that right is the right of access to the courts and such a right is not

compromised by the failure of the prison to address an inmate's grievance. <u>See</u>

<u>Flick v. Alba</u>, 932 F.2d 728, 729 (8th Cir. 1991) (federal grievance regulations

providing for administrative remedy procedure do not create liberty interest in

access to and resolution by that procedure); <u>See</u> <u>also</u> <u>Pressley v. Beard</u>, Civil No.

3:CV-04-2535, slip op. at 4 (M.D. Pa., Sept. 26, 2005)(Kosik, J.).  Accordingly,

Defendants are entitled to summary judgment with regard to Garraway's claim that

his constitutional rights were violated because two of his remedy requests were

rejected.

### 2.  Verbal Harassment

Garraway claims that USP-Lewisburg Defendant Chaplain Irizzary violated

his First Amendment rights when he said, "[t]hat's what you are...a gang!". (Doc.

27, Amended Complaint at Claim 15, ¶ 35).  He further states that USP-Canaan

Defendant Chaplain Johnson violated his First Amendment rights when he said

"Islam is responsible for two buildings missing in New York City" and "people

become Muslim for protection", as well as other derogatory remarks against

Muslims.  (Doc. 27, Amended Complaint at Claim 20, ¶ 40).

It has been recognized that the use of words generally cannot constitute an

assault actionable under § 1983. Johnson v. Glick, 481 F.2d 1028, 1033 n. 7 (2d Cir. 1973); Maclean v. Secor, 876 F. Supp. 695, 698-99 (E.D. Pa. 1995); Murray v. Woodburn, 809 F. Supp. 383, 384 (E.D. Pa. 1993) ("Mean harassment ... is insufficient to state a constitutional deprivation."); Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 189 (D. N.J. 1993) ("[V]erbal harassment does not give rise to a constitutional violation enforceable under § 1983."); and Jones v. Superintendent, 370 F. Supp. 488, 491 (W.D. Va. 1974). Nor is the use of racial slurs, as offensive as they are. Simmon v. Mallick, No. 10-739, 2010 WL 2079865, at 7-8 (M.D. Pa. April 21, 2010)

Mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations. Fisher v. Woodson, 373 F. Supp. 970, 973 (E.D. Va. 1973); see also Balliet v. Whitmire, 626 F. Supp. 219, 228-29 (M.D. Pa. 1986) ("[v]erbal abuse is not a civil rights violation ..."), aff'd, 800 F.2d 1130 (3d Cir.1986) (Mem.). A constitutional claim based only on verbal threats will fail regardless of whether it is asserted under the Eighth Amendment's cruel and unusual punishment clause, see Prisoners' Legal Ass'n, 822 F.Supp. at 189, or under the Fifth Amendment's substantive due process clause, see Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991).

Verbal harassment or threats, with some reinforcing act accompanying them, however, may state a constitutional claim. For example, a viable claim has been found if some action taken by the defendant escalated the threat beyond mere words. See Northington v. Jackson, 973 F.2d 1518 (10th Cir. 1992) (guard put a revolver to the inmate's head and threatened to shoot); Douglas v. Marino, 684 F.Supp. 395 (D. N.J. 1988) (involving a prison employee who threatened an inmate with a knife). Plaintiff's alleged instances of verbal harassment were not accompanied by any physical contact and thus, are constitutionally insufficient. See Hart v. Whalen, 2008 WL 4107651 * 10 (M.D. Pa. July 29, 2008). As a result, these claims will be dismissed.

A separate Order will be issued.

Dated: March 21, 2012

**United States District Judge**